**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
TAMPA DIVISION
Case No. _____

**HACIA ATHERTON**,

    Plaintiff,

v.

**PAUL VITALE**,

    Defendant.

_____ /

## COMPLAINT

Plaintiff Hacia Atherton hereby sues Defendant Paul Vitale for violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1595, based on Defendant's sex trafficking (§ 1591) and forced labor (§ 1589), intentional infliction of emotional distress, sexual cyber-harassment (Fla. Stat. § 784.049), stalking (Fla. Stat. § 784.048), assault, battery, false imprisonment, defamation, unjust enrichment, and invasion of privacy.

Viewer discretion is advised.

### *Introduction*

Paul Vitale trafficked, coerced, and physically and psychologically abused Hacia Atherton during and after their intimate relationship. While in the United States on a visa, Vitale isolated Ms. Atherton from her support system and seized control of her finances, immigration status, employment,

1

housing, medical care, and daily life. He used that control to coerce her into sexual conduct with himself and third parties for his own gratification and profit, arranging encounters through online platforms. He manipulated her through intimidation, threats, and psychological abuse, including threats about her immigration status—forced her to consume intoxicating substances, and secretly recorded and disseminated videos of their sexual activity without her consent.

When Ms. Atherton ended the relationship, Vitale maliciously launched a campaign of harassment: publishing false and defamatory statements, continuing to disseminate private images and recordings (*i.e.,* revenge porn), sending unwanted communications, and surveilling her movements—all intended to intimidate, monitor, and emotionally harm her.

As a direct result of Vitale's intentional and malicious conduct, Ms. Atherton has suffered severe emotional distress, mental anguish, humiliation, loss of privacy, reputational harm, and other injuries.

### *Jurisdiction & Venue*

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, specifically the Trafficking Victims Protection Act ("TVPA"). Plaintiff brings claims for violations of 18 U.S.C. §§ 1589 and 1591 and seeks civil remedies pursuant to 18 U.S.C. § 1595, which provides a private right of

2

action to victims of trafficking offenses. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

2.     This Court may properly exercise personal jurisdiction over Defendant because Defendant resides and is domiciled in Florida.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in the Middle District of Florida. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Clearwater Beach, Pinellas County, Florida, which is located within the Middle District of Florida.

## *Parties*

4.     Plaintiff, Hacia Atherton (hereinafter "Plaintiff" or "Ms. Atherton"), is an Australian citizen who currently resides, and at all times central to this Complaint resided, in Clearwater, Florida. Plaintiff was present in the United States pursuant to an E-3 visa—a visa category that allows Australian citizens to work in the United States for a specific employer— sponsored by Allstar Consulting Services, a corporation established and controlled by Defendant. Plaintiff is a CEO, CPA, speaker, author of the

3

Amazon Bestseller *Billion Dollar Blindspot: What is Your Workplace Culture Costing You*, and a workplace culture strategist focused on leadership, psychological safety, burnout prevention, and organizational performance. She is known for advising organizations on how workplace culture affects employee retention, profitability, and well-being.

5.    Defendant, Paul Vitale ("Defendant" or "Mr. Vitale"), is a citizen and resident of Clearwater, Florida. He is a retired FedEx pilot, the founder of the now-dissolved company Allstar Consulting Services, and, at all times central to this Complaint, exercised control over Plaintiff's residence and employment, thereby exerting dominion over her housing, immigration status, livelihood, mobility, and access to medical care.

## *Facts*

6.    Plaintiff, Ms. Atherton, who at the time was residing in Australia, met Defendant, Mr. Vitale, on or around February 1, 2025, through "Millionaire Match," an online matchmaking service and dating platform for high-net-worth individuals. During their initial video call that same day, Ms. Atherton and Defendant established an immediate rapport. Defendant presented himself as attentive and sincerely interested in forming a meaningful connection with Ms. Atherton.

7.    During this initial conversation, Defendant disclosed that he had previously participated in "swinging" and further indicated that, if the parties

4

pursued a romantic relationship, he envisioned the possibility of engaging in sexual encounters with other individuals or couples, including a potential "throuple-style" arrangement.

8. At the time, Ms. Atherton was intrigued by the possibility of such an arrangement but also understood these discussions as abstract descriptions of Defendant's preferences and believed that, if a relationship developed between them, any involvement of additional partners would be consensual, limited in nature, and would complement – rather than supplant – the committed relationship between Plaintiff and Defendant.

9. Over the ensuing weeks, Ms. Atherton and Defendant communicated regularly and developed an increasingly intimate and emotionally charged relationship. Through his words, conduct, and consistent attention, Defendant cultivated Ms. Atherton's trust and led her to believe that his intentions toward her were sincere and long-term in nature. Accordingly, Ms. Atherton disclosed deeply personal and sensitive information to Defendant, including her history of sexual abuse and related trauma.

10. Ms. Atherton also turned to Defendant for emotional support during periods of distress, including after experiencing trauma-related nightmares stemming from her ex-husband's abuse. During this same period, just weeks into their developing relationship, Ms. Atherton informed

5

Defendant that she was separated from her husband and in the process of getting divorced.

11. Ms. Atherton and Defendant met in person for the first time on February 20, 2025, when she traveled to Clearwater, Florida, to see him for his birthday on February 21, 2025. During her visit, Defendant purchased clothing, shoes, jewelry, and other gifts for Ms. Atherton, and lavished her with attention and affection.

12. While Ms. Atherton was visiting Defendant, Defendant encouraged her to participate in a sexual encounter involving him and another man, framing the request as something he wanted for his birthday. He showed her videos of his previous girlfriends participating in similar encounters and explained that sharing such experiences was how those women had demonstrated their love and commitment to him.

13. Intrigued by the idea, Ms. Atherton agreed and subsequently engaged in a consensual sexual encounter involving Defendant and a third party.

14. During the visit, Defendant also purchased and provided Ms. Atherton with a collar, informing her that, in the future, he would expect her to wear it to demonstrate her love and affection toward him. When Defendant first placed the collar around Plaintiff's neck, Plaintiff experienced a panic attack because it triggered memories of prior incidents in which her ex-

husband had strangled her. Initially, Defendant appeared to understand this limitation and removed the collar, explaining that she could take it off and put it back on gradually to build a "tolerance" to it. At the time, Plaintiff did not view the request that she wear a collar as significant, believing it to be merely a kink rather than a precursor to Defendant's increasingly controlling conduct.

15.   On or around February 22, 2025, Ms. Atherton headed to Tampa International Airport to fly back to Australia.

16.   Ms. Atherton then flew back to Australia. By this point, Ms. Atherton and Defendant were in a committed relationship, and they agreed that Plaintiff would apply for a visa, after which she intended to relocate to the United States to reside with Defendant in Clearwater.

17.   Because the parties desired to live together in the United States, Plaintiff sought guidance from an immigration attorney regarding her options for lawful entry. Plaintiff was advised that obtaining an E-3 visa would be the most expeditious means of relocating to the United States. Because Defendant wanted Plaintiff to relocate as quickly as possible, he told Ms. Atherton that she could work for him at a new company he planned to establish. Defendant represented that this arrangement would enable Plaintiff to obtain an E-3 visa, facilitate her entry into the United States, and allow the parties to build a business together that would support her career while providing the flexibility

7

to travel. Pending approval of the visa application, the parties agreed that Ms. Atherton would periodically visit Defendant in Clearwater.

18. On March 25, 2025, Ms. Atherton traveled to visit Defendant in Clearwater and stayed with him until May 5, 2025. It was during this trip that Mr. Vitale set expectations that Ms. Atherton would continuously wear a collar around her neck. This made Ms. Atherton uncomfortable, but she acquiesced. Throughout the course of their relationship, Defendant required Plaintiff to continuously wear this collar, not even permitting her to take it off for medical evaluations. When she tried to take the collar off, Mr. Vitale became angry.

19. In March, Plaintiff also learned that Mr. Vitale was, without her consent, recording some of their sexual encounters.

20. During this trip to the United States, Defendant took Ms. Atherton to a luxurious Caribbean resort. While there, or shortly beforehand, the parties opened a Bumble account in Plaintiff's name, seeking to arrange sexual activity with third parties – both men and women. The account was in Ms. Atherton's name but displayed photos of both Mr. Vitale and Ms. Atherton. At this point, usage of the account was consensual. Mr. Vitale additionally used his own dating applications to solicit women.

21. After returning, the couple traveled to Houston, Texas, where they remained until April 30, 2025.

8

22.    During their visit to Texas, Ms. Atherton received a call from a male colleague of hers whose wife was recently diagnosed with cancer. Plaintiff tried to provide emotional support to her friend during his time of need, but this angered Defendant, and he grabbed the collar to choke her while yelling, "this means I own you, you submit to me and do what I say." This was the first time Defendant physically abused Ms. Atherton. Believing that this was part of the "dom/sub" dynamic, as Defendant described it, Ms. Atherton did not immediately recognize the incident as abuse.

23.    On June 3, 2025, Defendant officially formed Allstar Consulting Services. The company had repeatedly been presented to Ms. Atherton as a consulting business that they would build together, and Ms. Atherton understood that its purpose was both to support her visa status and to develop professional consulting opportunities connected to her work. Overall, Ms. Atherton contributed at least $50,000 in either direct financial payments or the equivalent value of professional services toward the development and promotion of Allstar Consulting.

24.    These contributions included, among other things, approximately $30,000 associated with the development of the Allstar Consulting brand and website through Big Smoke Agency in Australia, as well as additional expenditures of approximately $20,000 directed toward public relations, media

9

exposure, and marketing initiatives intended to establish and promote the business and its professional profile.

25. On June 21, 2025, Ms. Atherton and Defendant traveled to Chicago for one of Plaintiff's professional conferences. In the lead-up to and during the trip, Defendant repeatedly spoke about his excitement regarding the business he was forming for Ms. Atherton to work at, even telling others about their new business venture. Ms. Atherton was excited at the prospect of working with Defendant.

26. During this trip, Defendant oscillated between being romantic and being controlling. He told Ms. Atherton that she would only be permitted to attend the conference sessions if she complied with his demands to participate in sexual encounters with men he arranged during the trip, reminding her that she had no choice but to comply if she wanted to keep her job at Defendant's company and obtain approval of her visa.

27. To facilitate the sexual encounters, Defendant used Fetlife and SDC (formerly "Swingers Date Club"), describing the encounters as "something in return" that Ms. Atherton was expected to provide in exchange for Defendant permitting her to attend the conference.

28. In the evenings, Defendant prevented Ms. Atherton from attending networking events and other professional opportunities associated with the conference, instead requiring her to return to the hotel room so that

10

men Defendant had solicited could visit and engage in sexual activity with Ms. Atherton. Over the course of this trip, Defendant compelled Plaintiff to engage in sexual encounters with four different men whom he had selected – first two men simultaneously in a "foursome," and then another two individually. Defendant himself participated in the "foursome," but refused to participate in the encounters involving the individual men, informing Plaintiff that he would merely watch while she engaged. This made Plaintiff uncomfortable because it represented a departure from typical "swinging." Ms. Atherton was additionally uncomfortable after learning that one of these men had recently been released from prison. During this trip, Defendant also compelled Ms. Atherton to ingest THC gummies.

29.     Plaintiff soon discovered that Defendant had, without her consent, posted nude photographs and sexually explicit "advertisements" featuring her on "swinger" websites, including SDC and FetLife.

30.     While Ms. Atherton was uncomfortable with what occurred in Chicago, she was excited about the business opportunity presented by Defendant and was also drawn to his romantic gestures. She hoped that his erratic behavior reflected a one-time lapse in judgment tied to his heightened excitement.

31.     Upon returning to Florida after the parties' trip to Chicago, Defendant continued to arrange sexual encounters with third parties. Ms.

11

Atherton had little to no involvement in arranging these sexual encounters and all communication was controlled by Defendant.

32.    On at least one occasion, a man whom Defendant had solicited referenced Ms. Atherton's unique tattoo *prior* to engaging in sexual activity with her. The tattoo, located on Plaintiff's pubic area, depicts an angel leaning backward with her hair extending between the wings and incorporates Plaintiff's name. Ms. Atherton did not disclose any information or photographs of her private tattoo on any social media or with the third parties beforehand. This demonstrated to Ms. Atherton that the man had seen her tattoo on one of the websites Defendant used for "advertising" her services.

33.    On August 14, 2025, Ms. Atherton's E-3 visa application was approved. The approval was directly tied to Plaintiff's employment with Allstar Consulting Services and was conditioned upon her working for Defendant through that company.

34.    On or around August 27, 2025, Ms. Atherton moved into Defendant's condominium in Clearwater with Defendant.

35.    Upon moving in, Defendant was affectionate and attentive, taking Ms. Atherton on dates and outings, including trips to a local petting zoo. But as the weeks went on, this dynamic shifted significantly.

36.    Within a few weeks of Ms. Atherton moving in, Defendant increased his use of the couple's Bumble account on Ms. Atherton's phone to

identify and communicate with men who would be willing to participate in sexual encounters. At first, this was still consensual and occurred one to two times a week. As time went on, however, Mr. Vitale instructed Ms. Atherton to use the account as a form of foreplay and became increasingly angry when she failed to spend what he considered enough time locating third parties for his sexual gratification.

37.     Soon, Defendant placed strict restrictions on the types of individuals Ms. Atherton was permitted to engage with, directing that the men she contacted were required to be black. Once someone expressed interest, Ms. Atherton was instructed to obtain his phone number and pass the information to Defendant, who would then take over communications and organize any meetings.

38.     Defendant maintained strict control over the arrangements and interactions involving the men he organized to come to the apartment. In most cases, Ms. Atherton was not permitted to communicate directly with the men beforehand, and Defendant coordinated the arrangements himself. When the men arrived, Defendant typically met them downstairs in the condominium lobby and brought them to the apartment, while Ms. Atherton remained in the bedroom.

39.     Defendant required Ms. Atherton to engage in sexual activity with different men, sometimes multiple times a day.

40. During some of these interactions with third parties, Defendant recorded Ms. Atherton, as well as other non-consenting third-party women, while they were engaged in sexual activity. Plaintiff never consented to being recorded.

41. Also in August, Defendant began to, on a recurring basis, electronically transmit some of these videos to his friend, John Narducci. On several occasions between August and November, Ms. Atherton personally observed Defendant using iMessage to transmit such videos.

42. In August, Mr. Vitale also began to require Plaintiff to speak about traumatic childhood experiences while performing sexual acts.

43. On multiple occasions, Defendant threatened to cancel Ms. Atherton's visa and report her to the immigration authorities if she did not comply with his sexual directives. In other words, Defendant expressly leveraged his control over Ms. Atherton's immigration status to ensure that she continued participating in unwanted sexual activity

44. During the relationship, Ms. Atherton experienced significant financial pressure, which contributed to her inability to escape the situation. At the time, her business was experiencing serious financial difficulties, she had used most of her personal savings attempting to stabilize her company, and she had borrowed money from both her mother and from Defendant on several occasions. Ms. Atherton's limited personal financial resources left her

14

financially vulnerable and unable to relocate independently or remove herself from the situation.

45.    In or around August or September 2025, Defendant woke Ms. Atherton up in the middle of the night and asked her to follow him into his office area. When she entered the room, Defendant had already prepared the space with his laptop open, a vibrator plugged in, and a pillow placed on the floor where he instructed her to sit. Defendant activated a VPN and opened the Tor browser, enabling anonymous access to the dark web. He then began searching for and displaying videos depicting child sexual abuse material. While this content was being displayed, Defendant instructed Ms. Atherton to perform sexual acts and stimulate herself with the vibrator while he masturbated and watched both the screen and her. Plaintiff felt coerced to comply with his instructions and did so.

46.    During this time, Defendant also significantly increased the use of drugs and alcohol before and during sexual activity. These substances included inhalants commonly referred to as "poppers" (a product branded as "Rush" containing alkyl nitrites), THC products, alcohol, and nitrous oxide ("whippets").

47.    Defendant preferred Ms. Atherton be under the influence of alcohol and THC when engaging with third party men. He also compelled Ms. Atherton to take "Rush," both when she was alone with him, as well as when

15

she engaged with others. Defendant would administer this substance by holding the bottle near her nose for inhalation while she was performing oral sex. After inhaling it, Ms. Atherton would experience immediate lightheadedness, confusion, weakness, body warmth, heightened sensitivity, and a feeling of almost passing out.

48.    On September 22, 2025, Ms. Atherton and Defendant traveled to Australia to visit Ms. Atherton's parents and attend a gala. While there, Ms. Atherton permanently vacated and closed her Australian residence, leaving her without a home in Australia. On September 24, while still in Australia, Defendant also accompanied Plaintiff to her divorce lawyer's office so that she could sign her divorce paperwork.

49.    When the parties returned to Clearwater on October 9, 2025, Defendant began increasing the number of "meetings" in which Ms. Atherton was compelled to have sex with third parties. It was also at this point that Defendant ceased engaging sexually with Plaintiff. Whereas previously Mr. Vitale would generally participate in third-party interactions, he began instead to stand in the corner and watch as Plaintiff engaged with others. Ms. Atherton was not comfortable with this arrangement, and expressed this to Defendant, asking him for more intimacy.  However, Defendant refused and told Ms. Atherton that, now that she had fallen in love with him, such intimacy

16

was no longer necessary. He further reminded her that her visa was contingent on her continued compliance.

50.    In October, while Plaintiff was in Australia, she tested positive for HSV (herpes). Accordingly, beginning in October, Ms. Atherton repeatedly requested that protection be used during sexual encounters. Defendant flatly refused those requests. In some situations, individuals with whom Ms. Atherton was forced to have sex also asked whether protection should be used, and Defendant similarly dismissed these requests. As a result, Ms. Atherton was frequently forced to engage in unprotected sexual activity despite harboring significant concerns about the safety and health risks.

51.    Between October 9 and late December, Defendant required Ms. Atherton to engage in sexual encounters with dozens of men. Defendant recorded several of these encounters without Ms. Atherton's consent, at times when Ms. Atherton was heavily under the influence.

52.    Several of the men with whom Ms. Atherton was required to engage in sexual activities made comments suggesting they were being paid. On multiple occasions, the men thanked her for the "reparations." At the time, Defendant kept large amounts of cash in their residence. During the relationship, Defendant raised the possibility of Ms. Atherton traveling to locations such as the Moonlite Bunny Ranch, a legal brothel in Nevada, and suggested that sexual encounters could be used to generate money. On several

occasions, he suggested Ms. Atherton could earn significant amounts of money in a short period of time through sex work and encouraged her to open an Only Fans account. These discussions while Plaintiff's ability to pursue legitimate consulting work was being restricted by Defendant, as he only permitted her to work the minimum number of hours required to keep her business in Australia afloat.

53. On at least two occasions, Defendant also took Ms. Atherton to a sex club called "Fantasy Land" after intoxicating her. While there, Defendant approached men and encouraged and facilitated third-party sexual encounters between these random, unknown men and Ms. Atherton. He additionally required Ms. Atherton to pick men out from the crowd that Defendant would then solicit. On one of these occasions, Defendant administered "Rush" to Ms. Atherton.

54. Defendant repeatedly told Ms. Atherton that the United States was extremely dangerous and that it was not safe for her to move around independently, stating that he needed to accompany her for her protection. To reinforce this narrative, he repeatedly showed Ms. Atherton YouTube videos depicting violence in the United States and instructed her that, if they were ever in public and an emergency or violent incident occurred, she should run and hide for cover until he found her.

55.     Defendant regularly carried a firearm and other self-defense items whenever the parties left the condominium and, on several occasions, expressed a desire to be in a situation where he could legally use his firearm in self-defense, making statements suggesting that he hoped someone might attempt to attack him so that he would have the opportunity to defend himself. These behaviors contributed to an environment in which Ms. Atherton felt increasingly dependent on Defendant for safety, while the constant focus on danger and violence created a heightened sense of fear and vulnerability.

56.     On or around October 14, 2025, Ms. Atherton sought to attend a professional networking event in Pennsylvania. Defendant, however, told Ms. Atherton that she was not permitted to attend, and that if she did, he would cancel her visa and prevent her from re-entering the apartment.

57.     Defendant also began to assert control over Ms. Atherton's medical care. He routinely booked all of Ms. Atherton's medical appointments himself, accompanied her to those appointments, did not allow her to be alone with medical practitioners, and controlled the scheduling and transportation associated with those visits.

58.     In late October, during a period of tension in the relationship, Defendant threatened to kill Ms. Atherton. Specifically, Defendant entered the bedroom and said words to the effect of: "Maybe I should do a murder-suicide.

19

Actually, why would I kill myself? I'll just shoot you. But that would be messy in the apartment. I could just throw you off the balcony instead."

59.    There was another occasion during this time in which the parties were in bed and Defendant placed his hand against Ms. Atherton's head in the shape of a gun and pretended to pull the trigger. This latter event scared Plaintiff because she knew Defendant owned and frequently carried a firearm.

60.    On another occasion, at some point between October and December 2025, Defendant forcibly required Plaintiff to view bestiality-related material against her will.

61.    Defendant also proposed a plan to rent a room at a low-cost motel and advertise on websites, including SDC and FetLife, that Plaintiff would be available there during a specific time to see how many men Plaintiff could engage with over a 24-hour period. Defendant stated that he would keep Plaintiff intoxicated with alcohol and drugs during the event to make it easier for her to participate.

62.    By late October, Ms. Atherton no longer desired to participate in sexual activities involving other parties, and she communicated this to Defendant. But Defendant told Ms. Atherton that her ability to travel or attend professional events related to her employment, which were necessary to maintain and support her visa status, was contingent upon her participation in these sexual activities.

63.    Between October and December 2025, Defendant repeatedly pinned Ms. Atherton to the bed, occluded one of her nostrils, and forced her to inhale "Rush" until she lost consciousness. He also chased her around the bedroom to force her to inhale it.

64.    During the same period, Defendant, on multiple occasions, used a whipped cream dispenser device containing small, pressurized cartridges of nitrous oxide gas to compel Ms. Atherton to inhale the gas against her wishes and when she was physically unable to refuse. On several occasions after inhaling the gases, Ms. Atherton became extremely disoriented and lost consciousness, only to wake up to Defendant raping her.

65.    These substances were often combined with THC products, including gummies and vape cartridges, as well as alcohol that Defendant would provide to Ms. Atherton in beverages despite her not wanting to consume it. The combined use of these substances significantly impaired Plaintiff's awareness and physical stability, and at times she became nauseous, physically ill, or heavily sedated.

66.    In late October, Defendant's attempts to compel Plaintiff to discuss highly personal traumatic experiences of childhood sexual abuse and sexual experiences from her prior marriage increased. Specifically, Defendant would intoxicate Ms. Atherton and require her to sexually stimulate herself with a vibrator while she recounted in graphic detail how a man had sexually abused

21

her at the age of five, including how the abuser would give her tea that made her feel "warm and floating," how he would physically violate her, and how he would force her to perform oral acts. Defendant required Ms. Atherton to provide these accounts in explicit detail despite the deeply traumatic nature of the memories. Defendant shared with Plaintiff that he fantasized about Plaintiff having sexual relations with her father and brother, and desired that she stimulate herself while engaging with his fantasy. She refused and instead fabricated a series of adult sexual experiences to share with Defendant rather than relive any past trauma for Defendant's sexual gratification. He would pin Ms. Atherton to the bed, force stimulation on her, and sit on her face to compel her to listen while he described these fantasies. While discussing these incestuous fantasies, he also forced Ms. Atherton to perform analingus on him against her will.

67.    Defendant further caused Ms. Atherton to become heavily intoxicated through a combination of alcohol, THC products, and inhalants, on several occasions, making her extremely disoriented and causing her to drift in and out of consciousness.

68.    Once Ms. Atherton became intoxicated, Defendant would restrain her and proceed to engage in penetrative sexual activity involving large sexual devices, including an approximately 12-inch-long and 3.5-inch-wide device and a second device approximately 15 inches long and 4.5 inches wide. During

22

these incidents, Ms. Atherton repeatedly begged Defendant to stop and told him she was in pain. Despite her pleas, Defendant continued. As a result, Ms. Atherton experienced vaginal bleeding and significant physical pain. Defendant refused to take Ms. Atherton to seek medical attention for these injuries.

69.    During this time, Defendant would physically restrain Ms. Atherton, holding her down while using sexual devices and insisting that she describe traumatic sexual experiences while he stimulated her.

70.    Defendant additionally began using a device he referred to as an "ass hook," which was attached by a rope to the collar he forced Ms. Atherton to wear. When worn, the device would tighten against the collar if Plaintiff moved in certain ways, causing pressure around her neck. Defendant required Ms. Atherton to wear this device in the home as a demonstration of submission and affection toward him.

71.    From October onwards, Mr. Vitale set the expectation that Plaintiff was to make him climax at least twice daily, telling her that he was used to climaxing five times a day and that she ought to be grateful that he was settling for less.

72.    In early November, Ms. Atherton and Defendant met with John Narducci for dinner. During the dinner, Mr. Narducci referenced the explicit

photos Defendant had sent him, stating that Ms. Atherton was "even more beautiful in person."

73.    On or around November 18, 2025, Ms. Atherton informed Defendant that she needed to attend a virtual board meeting for her family's company in Australia. Defendant told her that the only way she would be permitted to attend the board meeting was if she complied with his instructions to become intoxicated beforehand and engage in sexualized behavior during the call for his observation and gratification.

74.    Defendant required Ms. Atherton to record and send him videos and messages during the meeting and to respond to explicit material he sent to her while she was on the call. He also indicated that he wanted to come into the room and observe her during the meeting while these actions took place.

75.    Between October and December, Defendant also made Ms. Atherton sexually please him while he spoke to an artificial intelligence chatbot, instructing it to pretend to be a mother with her daughter engaging in sexual relations with him.

76.    In early December, Plaintiff's friend organized a party in Miami to celebrate Ms. Atherton's success with her book. Mr. Vitale originally agreed that they could attend but then changed his mind and told Plaintiff that if she went without him, he would cancel her visa.

77. Around this time, the parties also discussed the possibility of Mr. Vitale paying for breast augmentation surgery for Ms. Atherton as a Christmas gift. Defendant then informed Plaintiff that he had previously paid for a former girlfriend's breast implants, but that she left him after she recovered, and he threatened that if Plaintiff did the same, he would find her and cut them out of her.

78. On or around the morning of December 6, 2025, Defendant woke Ms. Atherton up and pressured her to consume a THC gummy, THC vape, Rush/poppers, whippets, and alcohol. He prepared a drink containing vodka, orange juice, and THC "buzz drops" and insisted that Ms. Atherton drink it while simultaneously encouraging her to smoke the vape and ingest the gummy.

79. During this time, Defendant made statements intended to pressure Ms. Atherton to continue drinking, including telling her she needed to "keep drinking breakfast to make daddy happy." While she was intoxicated, Defendant engaged in both vaginal and oral sex with Ms. Atherton. When she began to vomit from the quick ingestion of multiple intoxicating substances, Defendant stood over her and masturbated.

80. Later that night, Defendant invited another woman to the residence at approximately 2:00 AM for sexual activity involving the three of them, waking Ms. Atherton at 1:30 AM and telling her she had to shower and

get ready, and forcing her to vape despite her already being physically unwell. Ms. Atherton did not consent to any of the sexual activity but was so intoxicated that she could not resist sexual advances.

81. On the evening of December 23, after one of the encounters had taken place, Defendant initiated sexual activity with Ms. Atherton. Defendant became increasingly rougher and caused Plaintiff pain. During this interaction, Ms. Atherton repeatedly asked him to stop, but he continued. When Defendant was unable to climax, he became very angry and reminded Plaintiff that she was obliged to make him climax at least twice per day.

82. On the morning of December 24, 2025, Defendant continued to express anger toward Ms. Atherton and again raised the issue of her visa, suggesting that if the arrangements between them did not continue as he expected, there would be no reason for them to remain together.

83. Later that day, Ms. Atherton went for a walk on the beach and called her friend, explaining in detail what had been happening, including the pressure, the use of intoxicating substances, the sexual encounters with multiple men controlled by the Defendant, and Defendant's proposed hotel plan.

84. Ms. Atherton's friend strongly encouraged her to end the relationship. Later that day, Ms. Atherton approached Defendant to tell him that she wished to terminate the relationship and to discuss the parties'

26

financial and business affairs. Defendant became extremely agitated and angry and told her that if she left, he would make her regret her decision. Considering the circumstances leading to the end of the relationship, and fearing what Defendant might do to Ms. Atherton, Ms. Atherton's friend called the police.

85.   After Ms. Atherton ended the relationship, Defendant immediately terminated her employment.  Ms. Atherton offered to purchase the business from him or to organize a sale so that the entity connected to her visa could continue operating, but Defendant refused and dissolved the company that same day. This meant that Ms. Atherton was required to vacate the United States within sixty days and had to restart the process of applying for a visa. This caused her a great deal of anxiety.

86.   After leaving the relationship and vacating the Clearwater residence, Ms. Atherton stayed with friends for several nights. She did not have stable housing, slept on couches and shared beds until she was able to arrange more permanent accommodation. She was also forced to borrow money from her ex-husband before the divorce settlement was finalized.

87.   On or around December 25, a mutual friend introduced Ms. Atherton to Elisa Martinez who owned a nail salon in St. Petersburg.  Ms. Martinez and Plaintiff became friends, and Ms. Martinez allowed Plaintiff to stay with her and often invited Plaintiff to her nail salon.

88. Eventually, Ms. Atherton secured an apartment in St. Petersburg, where she remained while awaiting advice from her immigration attorneys in New York City, knowing she would soon have to leave the United States after Defendant terminated the entity sponsoring her visa.

89. Once the relationship ended, Defendant began to publicize the end of their relationship on the Internet. On Instagram, he changed his name to "Paul V – Hacia Atherton Expert" and in the biography section, he wrote, "Pilot for all of my life. Retired and looking forward to a new world of great people and places . . . Hacia Atherton cheated on me for a year."



90. On February 13, 2026, using this account, Defendant posted a reel (short Instagram video) containing numerous photos of Ms. Atherton and himself. Part of the audio states, "in love, full year relationship, soulmates, connected, committed to one another for the rest of your lives. Everything is

28

just going great. Well of course that's until she walks out on you on Christmas eve with absolutely no warning whatsoever. Then you find out she's been married for this entire year and then you find out she has been lying to you on just about every subject for the entire year. Merry Christmas to you." The caption to the reel reads, "Things Are Not Always As They Appear. #haciaatherton #thebilliondollarblindspot #ewit #iwd2026 #melbourne."



91.    On February 17, 2026, Defendant posted another reel to his Instagram account. The reel first showcases a photo of Ms. Atherton's book, *The Billion Dollar Blindspot*, along with the description, "a three-time Amazon bestseller, ranking #2 in both Strategy Management and Behavioral Psychology." Overlayed is text added by Defendant that states, "I paid for the Bestseller Badge" and the words "best seller" in a red circle with a diagonal slash. The reel explains a "trick" that can be used to sell "two copies or something and still be considered a best-seller." It explains, "pay this company some money and they buy a bunch of audio books for like 99 cents all at the same time, boosting your numbers so that you're a best seller for a couple of minutes but you get to say you're a best seller forever." At the end, there's

29

another picture of Plaintiff's book with a red slash through it. The caption to the reel states, "BEST SELLER BADGES EXPOSED!! NOT ALL BEST SELLERS ARE REAL!! Hacia Atherton used this trick to get her Best Seller Badge For the Billion Dollar Blindspot."



92.    On or around February 17, 2026, Defendant also published this same short-form video to LinkedIn.

93.    On February 21, 2026, Plaintiff was at Tampa International Airport preparing to return to Australia after Defendant terminated her employment, which was tied to her immigration status and required her to depart the United States within sixty days. She was traveling to attend another E-3 visa interview at the U.S. consulate to address her immigration

status and evaluate her legal options. Defendant appeared at her departure gate at the precise time she was scheduled to board her flight, causing Ms. Atherton to feel frightened and intimidated.

94.    On March 9, 2026, using the same Instagram account, Defendant posted a reel showcasing the resort in St. Vincent that he had taken Plaintiff to in April 2025. He wrote, "A year ago I took Hacia Atherton to this resort. I thought she was the love of my life. 8 months later I found out she was still sleeping with her husband, Simon Harris. Our whole relationship was just a way for her to get a US Visa and financial support while in the US. Betrayal doesn't even begin to describe the evil in her heart. Everything is not always as it seems." Defendant posted this same reel to Facebook on March 10, 2026.



95.    On or around March 11, 2026, Defendant transmitted a sexually explicit video of Ms. Atherton to her ex-husband, Simon Harris, on Facebook Messenger. The video clearly shows Ms. Atherton engaging in sexual activity with several men. Ms. Atherton never consented to this video being taken or shared.

96.    On March 14, 2026, Defendant posted a photo to Instagram of himself standing next to two women. The text in the photo reads, "Dating Hacia Atherton for a year: $100,000. Life after she's gone: PRICELESS!" The caption of the photo reads, "Moving On After The Lies & Deception of Hacia Atherton Author of the Billion Dollar Blindspot."



97.    On March 30, 2026, Defendant posted another reel with the text "The Book Hacia Atherton Should Have Written, Not the Billion Dollar Bindspot." *The Billion Dollar Blindspot* is the name of a book that Ms. Atherton published in 2025. The reel shows a fictitious book titled "Secrets of a Scammer's Success," with several pictures of Ms. Atherton. The caption of the photo reads, "Hacia Atherton, Lies, Deceit, and Dual Life. Not someone to take business or life advice from. The Billion Dollar Blindspot doesn't tell the real story. Other images in the reel include fictitious chapters of this book:





98.    Defendant has engaged in a persistent pattern of unwanted contact and harassment directed at Ms. Atherton. Despite Ms. Atherton's repeated efforts to cease all communication, Defendant continuously attempted to contact her through telephone calls, text messages, emails, and direct messages through social media. Ms. Atherton has blocked Defendant's phone number, email address, and social media accounts. Nevertheless, when one account is blocked, Defendant would continue to create new accounts or

profiles on various social media platforms to communicate with Plaintiff, view her activity, and contact her further.

99.    On May 10, 2026, after working with her Australian lawyer to secure another visa, Ms. Atherton returned to the United States.

100.    Defendant continued to pursue and harass Ms. Atherton by monitoring her whereabouts and movements and appearing at locations where Ms. Atherton was present or likely to be present. Defendant began frequenting locations he had not previously visited, including the nail salon Ms. Atherton regularly did her nails, despite the salon being far away from Defendant's residence. He posted a reel of himself getting a pedicure at this location on May 20 – just ten days after Ms. Atherton returned to the United States. Ms. Atherton never frequented this nail salon during the parties' relationship as she only met Ms. Martinez, the owner of the nail salon, *after* she broke up with Mr. Vitale.



101. As a result of Defendant's intentional, tortious, and unlawful conduct, Ms. Atherton has suffered, and continues to suffer, from PTSD, depression, disrupted sleep patterns, anxiety attacks, hypervigilance, a persistent sense of psychological instability, and an impaired ability to function in both her personal and professional life.

102. Ms. Atherton is currently receiving treatment at the Suncoast Center in St. Petersburg, Florida. She has additionally faced lost business opportunities as a direct result of Defendant's online disparagement of her professional credentials.

## COUNT I: Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1591 (Sex Trafficking), Pursuant to 18 U.S.C. § 1595

103. Plaintiff re-alleges and incorporates by reference Paragraphs 1 – 102 as if fully set forth herein.

104.    Plaintiff is entitled to bring this civil action pursuant to 18 U.S.C. § 1595(a), which provides a private right of action for victims of trafficking under 18 U.S.C. § 1591.

105.    Defendant's conduct occurred in and affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1591(a)(1). Defendant recruited Plaintiff from Australia to relocate to the United States, arranged for Plaintiff to cross international borders and travel between multiple states including Florida, Texas, Illinois, and New York, used interstate internet platforms (including Bumble, SDC, and Fetlife) to facilitate commercial sex acts, and solicited men from various locations to travel to Defendant's residence in Clearwater, Florida to engage in sexual encounters with Plaintiff.

106.    Between February and August 2025, Defendant knowingly recruited, enticed, and transported Plaintiff to relocate from Australia to Florida under the false pretenses of building a legitimate consulting business and romantic partnership, while intending to cause Plaintiff to engage in commercial sex acts and become dependent on Defendant for her employment and immigration status, among other things.

107.    Once Plaintiff relocated to Florida on or around August 27, 2025, and continuing until she terminated the relationship in late December 2025, Defendant knowingly harbored and maintained Plaintiff in his residence for the purpose of causing her to engage in commercial sex acts.

108.    Defendant exercised near-total control over Plaintiff's living situation, employment, immigration status, mobility, medical care, finances, and social interactions, ensuring that Plaintiff could not leave without losing her employment and ability to remain lawfully in the United States.

109.    Defendant also knowingly advertised Plaintiff for commercial sex acts. Without her consent, Defendant posted sexually explicit "advertisements" of Plaintiff on Fetlife and SDC and used Bumble to identify, solicit, and recruit men to engage in sexual encounters with Plaintiff.

110.    Beginning in late August and continuing through December 2025, Defendant caused Plaintiff to engage in commercial sex acts with approximately twenty men. These activities were commercial within the meaning of 18 U.S.C. § 1591(e)(3) because:

    a. Upon information and belief, Defendant received financial compensation from the men he recruited to engage with Plaintiff. In or around August or early September, several of the men thanked Plaintiff after she engaged in sexual activities with them, including references by some of them to payment of "reparations."

    b. Defendant discussed using Plaintiff to generate money through sex work at the Moonlite Bunny Ranch.

    c. Defendant conditioned Plaintiff's continued employment, housing, access to professional conferences, travel, and visa sponsorship –

and therefore her ability to remain in the United States – on her submission to sexual encounters with men Defendant solicited.

111.  Under 18 U.S.C. § 1591(e)(3), continued employment, associated professional benefits, housing, immigration status, and the ability to remain in the United States each constitute "anything of value" given to or received by a person on account of a sex act, and therefore render the coerced sexual acts commercial in nature. *See, e.g.*, *Doe v. Knight*, 624 F. Supp. 3d 857 (N.D. Ill. 2022) (career advancement opportunities constitute "anything of value"); *Noble v. Weinstein*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018) (professional opportunities constitute things of value); *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 315 (S.D.N.Y. 2019) (professional relationships and career opportunities constitute things of value).

112.  Defendant knowingly used force, threats of force, fraud, coercion, and combinations thereof, as defined in 18 U.S.C. § 1591(e)(2), to cause Plaintiff to engage in commercial sex acts, including by repeatedly stating, from August 2025 onward, that Plaintiff's employment and immigration status were contingent upon her participation in sexual encounters with third parties; conditioning her ability to attend work functions on acquiescence to sexual encounters with third parties; threatening to contact immigration authorities and have her visa canceled if she refused to participate in such encounters;

and, in or around late October 2025, threatening to commit a "murder-suicide," to shoot Plaintiff, and to throw her off a balcony.

113. Defendant repeatedly stated that he owned and carried a firearm, expressed a desire to use it, and, on one occasion, placed his hand against Plaintiff's head and simulated pulling the trigger.

114. Throughout the course of the relationship, Defendant coerced and forced Plaintiff into consuming intoxicating substances, including THC, alcohol, alkyl nitrites, and nitrous oxide, and thereafter arranged for and solicited third-party men to come to the apartment to engage in sexual acts with Plaintiff while she was severely intoxicated.

115. Defendant's coercion was part of a continuous pattern of physical violence, rape, sodomy, and forced intoxication that created an environment of fear and compelled Plaintiff's compliance with Defendant's demands for commercial sexual activity.

116. Defendant repeatedly demonstrated to Plaintiff that if she did not acquiesce to his demands, he would physically abuse her. For example, while in Texas in late April 2025, knowing about Plaintiff's trauma and vulnerability with things around her neck, Defendant choked Plaintiff, yelling "this means I own you, you submit to me and do what I say."

117. Between October and December 2025, Defendant repeatedly pinned Plaintiff down and forced her to inhale nitrous oxide gas and alkyl

40

nitrates, after which he engaged in sexual activity with Plaintiff, and beginning in late October or early November and through the end of December, Defendant caused Plaintiff to become intoxicated and, while she was incapacitated, repeatedly sodomized her with large sexual devices, including one which was approximately 15 inches long and 4.5 inches wide.

118. As a result of these knowing, intentional, and outrageous violations of 18 U.S.C. § 1591, Defendant is liable to Plaintiff for actual damages, punitive damages, and reasonable attorneys' fees.

### COUNT II: Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589 (Forced Labor), Pursuant to 18 U.S.C. § 1595

119. Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as if fully set forth herein.

120. Plaintiff is entitled to bring this civil action pursuant to 18 U.S.C. § 1595(a), which provides a private right of action for victims of forced labor under 18 U.S.C. § 1589.

121. Defendant knowingly obtained Plaintiff's labor and services in violation of 18 U.S.C. § 1589 by means of (a) force and threats of force; (b) physical restraint and threats of physical restraint; (c) serious harm and threats of serious harm, (d) abuse and threatened abuse of law and legal process, and (e)  a scheme, plan, and pattern intended to cause Plaintiff to believe that noncompliance would result in serious harm and physical

restraint. Specifically, Defendant used the foregoing means to compel Plaintiff to perform sexual acts and provide sexual services to Defendant and to third parties recruited and arranged by Defendant.

122. The sexual acts Plaintiff was compelled to perform constitute "labor or services" within the meaning of 18 U.S.C. § 1589. *See Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017) (labor or services in § 1589 is not limited to work in an economic sense and extends to forced sexual acts); *United States v. Kaufman*, 546 F.3d 1242, 1259–63 (10th Cir. 2008) (same).

123. Between August and December 2025, Defendant repeatedly assaulted Plaintiff, using physical violence to coerce her compliance with his demands and to reinforce his control over her to prevent her from refusing him. This constitutes force, physical restraint, serious harm, and a pattern intended to cause Plaintiff to believe that noncompliance would result in serious harm and physical restraint.

124. On multiple occasions, including on December 6, 2025, Defendant physically restrained Plaintiff and rendered her unconscious through the use of incapacitating substances, after which Defendant engaged in sexual acts with her, forced her to stimulate herself while recounting traumatic events of her childhood, summoned third parties to sexually engage with her, and sodomized her. This constitutes force, physical restraint, serious harm, and a

pattern intended to cause Plaintiff to believe that noncompliance would result in serious harm and physical restraint.

125. On at least two occasions during the relationship, Defendant drugged Plaintiff and transported her to a location referred to as "Fantasy Land," where he forced her to engage in sexual acts with men Defendant had solicited. This constitutes force and serious harm.

126. Between February and December 2025, Defendant further exercised domination and coercive control over Plaintiff by forcing her to wear a collar as a symbol of submission and ownership.

127. During a trip to Texas in late April 2025, Defendant choked Plaintiff with the collar he required her to wear while telling her, "This means I own you—you submit and do what I say." Defendant additionally used a device he referred to as an "ass hook," attached by rope to the collar, to physically control Plaintiff and compel her submission to his sexual demands. This constitutes force, physical restraint, and serious harm under 18 U.S.C. § 1589(a). *See also United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (defining harm as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm").

43

128. In or around late October 2025, Defendant threatened to murder Plaintiff, shoot her, and throw her off a balcony. He reminded her that he owned a firearm and had a desire to use it and placed his hand against her head and simulated pulling the trigger. This constitutes threats of force and threats of serious harm under 18 U.S.C. § 1589(a)(1)-(2).

129. Defendant additionally obtained Plaintiff's sexual services by means of abuse and threatened abuse of law and legal process within the meaning of 18 U.S.C. § 1589(a)(3). Defendant sponsored Plaintiff's E-3 visa through Allstar Consulting Services, a company he solely owned and controlled, and repeatedly wielded Plaintiff's immigration status as an instrument of coercion.

130. On multiple occasions between June and December 2025, Defendant explicitly told Plaintiff that her visa was contingent upon her compliance with his demands for sexual activity with third parties, threatened to contact immigration authorities if she refused his demands, and told her she would not be permitted to re-enter the apartment if she disobeyed.

131. For example, on or around June 21, 2025, while the parties were in Chicago, Defendant told Plaintiff that she would only be permitted to attend professional networking events if she complied with his demands to participate in third-party sexual encounters and that she had no choice but to comply if she wanted to obtain her visa. Defendant knew that Plaintiff had no

independent means to maintain her lawful presence in the United States, that as of October 2025, she had permanently closed her residence in Australia, and that deportation would result in catastrophic personal and professional consequences.

132. Defendant's threats to manipulate, terminate, and weaponize Plaintiff's immigration status constituted abuse and threatened abuse of law and legal process within the meaning of 18 U.S.C. § 1589(a)(3). *See Dann*, 652 F.3d at 1172 (threats related to immigration status can constitute abuse of the legal process under the TVPA).

133. Beginning in February 2025, Defendant used romantic gestures and promises of personal and professional opportunities to lure Plaintiff from Australia to the United States under false pretenses. He then systematically isolated Plaintiff by: facilitating the closure of her Australian residence so that she had no home to which to return; sponsoring her E-3 visa through a company he solely owned and controlled, thereby ensuring her legal presence in the United States depended entirely on his discretion; restricting her ability to attend professional events and speak to her friends; controlling her medical care by booking all appointments, accompanying her, refusing to allow her to be alone with practitioners, and insisting that she wear the collar during treatment; telling her that the United States was dangerous and she could not safely move about independently; and creating financial dependence by

ensuring the consulting business generated no legitimate except for her own contributions and a small contribution made by Mr. Vitale.

134. This escalating pattern of isolation, dependence, and control was designed to – and did – cause Plaintiff to believe that noncompliance with Defendant's demands for sexual services would result in serious harm to her physical and emotional safety, employment, housing, and immigration status. This pattern constitutes a common plan, scheme, or pattern under 18 U.S.C. § 1589(a)(4).

135. As a direct and proximate result of Defendant's knowing, intentional, and outrageous violations of 18 U.S.C. § 1589, Defendant is liable to Plaintiff for actual damages, punitive damages, and reasonable attorneys' fees.

## COUNT III: Intentional Infliction of Emotional Distress

136. Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as if fully set forth herein.

137. Defendant's conduct was so extreme in degree and so far beyond all possible bounds of decency as to be regarded as atrocious, utterly intolerable, and absolutely shocking in a civilized community. Defendant's course of conduct was not a momentary lapse in judgment but rather a prolonged, calculated campaign of abuse, degradation, and psychological torture deliberately designed to subjugate, humiliate, and destroy Plaintiff's

mental and emotional well-being. Defendant knew, or should have known, that emotional distress would likely result.

138. Defendant's deliberate, outrageous, intentional, and relentless conduct included, but was not limited to:

a. Systematically and deliberately deceiving Plaintiff through false promises of love, commitment, and professional opportunity in order to gain her trust, isolate her from her support network, render her financially and legally dependent, and ultimately reduce her to a state of complete vulnerability and submission—all as a premeditated scheme to coerce her into sexual servitude with numerous men, while Defendant watched, directed, orchestrated, and in some instances recorded, without Plaintiff's consent. This calculated manipulation exploited a grossly unequal power dynamic in which Defendant exercised totalitarian control over Plaintiff's employment, immigration status, housing, finances, medical care, freedom of movement, and access to her family, and knowingly targeted Plaintiff's particular emotional and psychological vulnerabilities, including her childhood trauma, her desire for romantic connection, and her professional aspirations. *See, e.g., Jenks v. Naples Comm. Hosp.*, 829 F. Supp. 2d 1235, 1256 (M.D. Fla. 2011) (when a defendant has knowledge

of a plaintiff's particular susceptibility to distress, a lower standard of outrageousness may apply); *Liberty Mut. Ins. Co. v. Steadman*, 968 So.2d 592, 596 (Fla. 2d DCA 2007) (citing Restatement (Second) of Torts, § 46 cmt. e. (the unequal position of the parties in a relationship, where one asserts and has the power to affect the interests of the other, may also supply the heightened degree of outrageousness required for a claim of intentional infliction of emotional distress)).

b. Repeatedly rendering Plaintiff physically incapacitated through forced ingestion and inhalation of dangerous intoxicating substances—including alcohol, THC, alkyl nitrites ("poppers"), and nitrous oxide—to the point of unconsciousness, loss of motor control, severe disorientation, and inability to consent or resist—then brutally assaulting her sexually while she was helpless, vulnerable, and unaware, and in some instances summoning third parties to engage in sexual acts with Plaintiff's incapacitated body, creating conditions of acute physical danger including risk of asphyxiation, seizure, and aspiration of vomit;

c. Rendering Plaintiff heavily intoxicated and repeatedly sodomizing her with extremely large sexual devices (measuring approximately 12 inches by 3.5 inches and 15 inches by 4.5 inches respectively)

48

causing vaginal bleeding, severe lacerations, intense pain, physical injury, and lasting trauma—all while deliberately ignoring and disregarding Plaintiff's desperate, repeated, and explicit pleas for Defendant to stop, refusing to seek medical attention for her injuries, and mocking her pain and suffering;

d. In early September 2025, forcing Plaintiff to witness graphic child sexual abuse material accessed through the dark web—videos depicting the rape and brutal exploitation of children—while compelling Plaintiff to sexually stimulate herself and perform sexual acts, thereby subjecting Plaintiff to content depicting the most extreme form of human rights abuse and trauma, and on another occasion between October and December 2025, forcing Plaintiff to view bestiality-related material against her will;

e. Deliberately weaponizing Plaintiff's history of childhood sexual abuse by intoxicating her and brutally forcing her—against her will and while physically restraining her—to recount in explicit and graphic detail her traumatic memories of being sexually abused at age five, including descriptions of the perpetrator giving her tea to make her feel "warm and floating" and forcing her to perform oral sex, all while Defendant forced her to simultaneously sexually stimulate herself with a vibrator.

f. Additionally, Defendant subjected Plaintiff to sadistic sexual torture by describing his own perverted fantasies of Plaintiff's own father and brother having sexual intercourse with her, pinning her to the bed, forcing stimulation upon her, and sitting on her face to compel her to listen to these depraved fantasies while she was physically restrained and helpless to escape.

g. Deliberately and sadistically exploiting Plaintiff's documented psychological trauma from a prior incident of domestic violence in which her former husband had strangled her, and her known trigger response to pressure around her neck, by coercing her into wearing a restrictive collar on a twenty-four-hour, full-time basis without removal, choking her with that collar while screaming "this means I own you," and attaching a painful "ass hook" device to the collar that would tighten and cause increasing pressure and pain around her neck when she moved, all intentionally designed to trigger her severe panic attacks, flashbacks to her prior strangulation trauma, and psychological retraumatization. Defendant deliberately framed this systematic torture as a form of "exposure therapy" to gaslight Plaintiff and convince her that his sadistic abuse was therapeutic—a calculated psychological

manipulation designed to make Plaintiff blame herself rather than hold Defendant accountable for his brutality.

139. The cumulative pattern of conduct—spanning over ten months, involving multiple forms of abuse occurring on a daily or near-daily basis, with each form of abuse escalating in severity and depravity—demonstrates clear intentionality, premeditation, and a deliberate design to cause severe and lasting psychological harm. An ordinary, reasonable person viewing this cumulative, unrelenting course of conduct would not merely find Defendant's actions to be outrageous, but would find them to be absolutely unconscionable, indefensible, and utterly reprehensible.

140. As a direct and proximate result of Defendant's extreme, outrageous, willful, and wanton conduct, Plaintiff has suffered severe emotional distress and serious psychological injury, including post-traumatic stress disorder, anxiety, panic attacks, and depression, and has required ongoing psychiatric treatment and care.

### COUNT IV: Sexual Cyber-Harassment (Fla. Stat. § 784.049)

141. Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as if fully set forth herein.

142. This claim is brought pursuant to Florida Statutes § 784.049, which allows an aggrieved person to initiate a civil action against a person who sexually cyber-harasses another to obtain all appropriate relief, including

51

injunctive relief, monetary damages (not less than $10,000 or actual damages, whichever is greater), and reasonable attorney's fees and costs.

143. Beginning in or around March 2025, Defendant, on a multitude of occasions, intentionally and without Plaintiff's consent recorded Plaintiff engaging in sexual activities with third-party men whom Defendant had solicited. He then disseminated several of these videos. Specifically, Defendant:

a. Without Plaintiff's knowledge or consent and at all relevant times, posted nude photographs of Plaintiff and sexually explicit advertisements featuring Plaintiff on "swinger" websites, including SDC and FetLife. These postings, at a minimum, displayed Plaintiff's unique and identifiable tattoo, thereby enabling third parties to recognize and identify Plaintiff as the individual depicted;

b. Knowingly and without Plaintiff's consent electronically transmitted sexually explicit videos of Plaintiff to Defendant's friend, John Narducci, via iPhone message. The videos clearly depicted Plaintiff's face and showed Plaintiff engaging in sexual activity with several men whom Defendant had solicited. On several occasions, Plaintiff personally observed Defendant transmitting such material, and when the parties met for dinner

in November 2025, Mr. Narducci referenced the explicit content, stating that Plaintiff "was even more beautiful in person";

c. Knowingly and without Plaintiff's consent transmitted sexually explicit videos of Plaintiff—clearly depicting her face—to Plaintiff's ex-husband, Simon Harris, via Facebook Messenger. The videos depicted Plaintiff engaging in sexual activity with multiple men who had been solicited by Defendant.

144. Defendant's conduct was contrary to Plaintiff's reasonable expectation of privacy, done for no legitimate purpose, with the intent to cause Plaintiff substantial emotional distress, and has in fact caused Plaintiff severe harm.

## Count V: Stalking (Fla. Stat. § 784.048)

145. Plaintiff realleges and incorporates by reference Paragraphs 1 to 102 as if fully set forth herein.

146. At all material times, Defendant engaged in a willful, malicious, and repeated course of conduct directed at Plaintiff, through electronic communications, internet-based activity, and in-person surveillance, that caused Plaintiff substantial emotional distress and served no legitimate purpose.

147. Following the termination of their relationship, Defendant engaged in a sustained campaign of harassment directed at Ms. Atherton. Defendant repeatedly published statements concerning Ms. Atherton on social media, accusing her of dishonesty, fraud, infidelity, and other misconduct.

148. Defendant engaged in a course of conduct directed at Ms. Atherton through electronic communications, including but not limited to:

    a.    Repeatedly publishing posts and comments about Ms. Atherton and her business on social media;

    b.    Sending messages or other electronic communications directly to Ms. Atherton;

    c.    Encouraging and soliciting third parties to contact Ms. Atherton by commenting, posting, or sending private messages about Ms. Atherton electronically or on social media, including the dissemination of sensitive images of Plaintiff;

    d.    Encouraging, soliciting, or inciting third parties to contact, monitor, harass, or communicate with Ms. Atherton via electronic means (as a result, third parties contacted Ms. Atherton causing further distress); and

    e.    Disseminating information, including sensitive and private images, of Ms. Atherton online.

149. Defendant further pursued and harassed Plaintiff by monitoring her whereabouts and movements and appearing at locations where Plaintiff was present or likely to be present despite having no legitimate reason to be there.

150. On or about February 21, 2026, Defendant appeared at Tampa International Airport while Plaintiff was departing for Australia. Upon information and belief, Defendant knew Plaintiff would be present at the airport and appeared there for the purpose of monitoring, intimidating, or harassing Plaintiff.

151. Defendant also began frequenting the nail salon where Ms. Atherton regularly obtained nail services, despite the salon being located a significant distance from Defendant's residence and not being a location Defendant had ever visited.

152. Additionally, Chapter 18 of the fictitious book Mr. Vitale posted to Instagram on March 30, 2026, is titled *"Nail Salons and Naughty Nights – The Adventures with Elisa Martinez."* Plaintiff did not know Ms. Martinez during her relationship with Defendant and only became acquainted with her after the parties separated. The use of Ms. Martinez's name in the chapter title caused Plaintiff to reasonably believe Defendant was tracking or monitoring her activities and contacts after the relationship ended.

153.    Defendant's repeated electronic communications, online activity, surveillance, and appearances at locations where Ms. Atherton was present constitute a course of conduct directed at Plaintiff.

154.    Defendant's conduct served no legitimate purpose and was intended to harass, intimidate, embarrass, threaten, and cause emotional distress to Ms. Atherton.

155.    As a direct and proximate result of the Defendant's conduct, Plaintiff suffered substantial emotional distress, mental anguish, humiliation, embarrassment, fear, reputational harm, and disruption to her personal and professional life.

## Count VI: Assault

156.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as if fully set forth herein.

157.    In late October 2025, Defendant threatened Plaintiff by stating, in substance that "maybe I should do a murder-suicide. Actually, why would I kill myself? I'll just shoot you. But that would be messy in the apartment. I could just throw you off the balcony instead." During the same time period, he placed his hand against Plaintiff's head and simulated pulling the trigger. He additionally threatened to rip out her breast implants were she to get them and then subsequently leave the relationship. Defendant had the apparent

ability and inclination to carry out these threats as he owned and carried a firearm and frequently expressed to Plaintiff a desire to be placed in a situation where he could use his firearm.

158.  Plaintiff's fear of imminent violence was objectively well-founded because Defendant engaged in a sustained ten-month long campaign in which he physically abused, raped, and sodomized Plaintiff, demonstrating that he was capable of using violence against her. *See Boucher v. Warren*, 291 So.3d 597, 603 (Fla. 4th DCA 2020) (holding that a threat to kill, coupled with multiple prior acts of physical violence and additional intimidating conduct toward the victim, may constitute sufficient evidence to establish reasonable cause to believe the victim was in imminent danger of violence).

159.  As a direct and proximate result of Defendant's assaults, Plaintiff has suffered and continues to suffer severe emotional distress.

### Count VII: Battery

160.  Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as if fully set forth herein.

161.  Between April and December 2025, Defendant intentionally and repeatedly caused harmful and offensive physical contact with Plaintiff without Plaintiff's consent. The acts constituting battery include:

a. In late April 2025, while the parties were in Texas, Defendant grabbed Plaintiff by the collar, attempted to choke her, and stated, "this means I own you, you submit to me and do what I say."

b. In late April 2025, while the parties were in Texas, Defendant grabbed Plaintiff by the collar she was wearing around her neck and choked her while yelling, "this means I own you, you submit to me and do what I say;"

c. On multiple occasions between October and December 2025, Defendant physically pinned Plaintiff down, held one of her nostrils closed, and forcibly caused her to inhale alkyl nitrites and nitrous oxide until she lost consciousness;

d. Beginning in late October or early November 2025 and continuing through December 2025, Defendant caused Plaintiff to become heavily intoxicated, physically restrained her, and sodomized her with extremely large sexual devices—including one measuring approximately 12 inches long and 3.5 inches wide and another measuring approximately 15 inches long and 4.5 inches wide—causing vaginal bleeding, severe lacerations, and intense physical pain;

e. Defendant repeatedly rendered Plaintiff incapacitated through the administration of intoxicating substances—including alcohol,

THC, alkyl nitrites, and nitrous oxide—and thereafter engaged in vaginal and oral sex with Plaintiff while she was unconscious or so severely impaired that she was unable to consent or resist. Defendant also summoned third-party men to the residence and caused them to engage in sexual acts with Plaintiff's incapacitated body;

f. On several occasions between October and December 2025, Defendant pinned Plaintiff to the bed, forcibly stimulated her, sat on her face, and forced her to engage in vaginal and oral sex with him;

g. Between late October or early November and December 2025, Defendant, on multiple occasions, forced Plaintiff to wear a collar and attached to it a device referred to as an "ass hook," secured by a rope that tightened around Plaintiff's neck upon movement, causing pain and pressure.

162. Each of the foregoing acts was committed by Defendant intentionally and without Plaintiff's consent. Defendant's conduct was willful, malicious, and undertaken with conscious disregard for Plaintiff's physical safety, bodily autonomy, and well-being.

163.    As a direct and proximate result of Defendant's batteries against Plaintiff, Plaintiff has suffered and continues to suffer severe physical injuries and pain and severe emotional distress and psychological trauma.

## COUNT VIII: False Imprisonment

164.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as if fully set forth herein.

165.    Defendant unlawfully, and without legal authority or "color of authority," restrained Plaintiff without her consent and against her will, thereby depriving her of her liberty and freedom of movement.

166.    Between June and December 2025, Defendant, on numerous occasions, forcibly restrained Plaintiff's movement, including by choking her, raping her, sodomizing her, pinning her to the bed, holding her down, drugging her, and sitting on her face so that she could not move. These acts were against Plaintiff's will and without legal authority or color of authority.

167.    Each such act constitutes false imprisonment. *See Oakes v. State*, 85 So.3d 526, 526-527 (Fla. 1st DCA 2012) (false imprisonment "may be completed by the simple momentary grasp of another person" as "[t]he essence of false imprisonment is the act of depriving the victim of personal liberty or *freedom of movement* for any length of time (emphasis in original).

168. As a direct and proximate result of Defendant's false imprisonments, Plaintiff has suffered and continues to suffer severe physical injuries and pain and severe emotional distress and psychological trauma.

## COUNT IX: Defamation *Per Se*

169. Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as if fully set forth herein.

170. Beginning in or around late December 2025 and continuing through at least March 2026, Defendant published at least eight false and defamatory statements of fact concerning Plaintiff to third parties via his public Instagram account, Facebook profile, and LinkedIn account, all of which were accessible to members of the general public, Plaintiff's professional contacts, family and friends, colleagues, and clients.

171. Through these statements, Defendant accused Plaintiff of cheating on him, concealing her marriage to her ex-husband, abusing the immigration system, and engaging in fraudulent or deceptive manipulation of sales to obtain a "best seller" designation she did not legitimately earn.

172. Plaintiff is a private figure. She has not attained pervasive fame or notoriety, does not occupy a position of public prominence, and has not voluntarily injected herself into any public controversy to become a public figure for defamation purposes.

173. Defendant published these statements with actual malice, intending to injure Plaintiff and knowing that they were false. Defendant knew that Plaintiff was separated from, and later divorced from, her ex-husband, as Plaintiff informed him of these facts and he accompanied her to sign the divorce paperwork. Further, Defendant knew that Plaintiff conducted her business ventures lawfully and without deception, and that she was not involved in any immigration fraud. In the alternative, and at a minimum, Defendant acted negligently in publishing these false statements.

174. Defendant's false and defamatory statements include the following:

    a. Defendant's "biography" section on his Instagram profile reading, . . . "Hacia Atherton cheated on me for a year";

    b. Defendant's February 13, 2026 Instagram reel, in which the audio states, ". . . Then you find out she has been married for this entire year and then you find out she has been lying to you on just about every subject for the entire year," and the caption reads, "Things Are Not Always As They Appear. Hacia Atherton Author of The Billion Dollar Blindspot lived a double life.";

    c. Defendant's February 17, 2026, Instagram reel and corresponding LinkedIn short-form video falsely accusing Plaintiff of

fraudulently manipulating book sales to obtain "best-seller" status, including by claiming Plaintiff used a paid "trick" to artificially inflate sales rankings and that she was not a legitimate best-selling author. The reel further stated that Plaintiff "used this trick to get her Best Seller Badge" for The Billion Dollar Blindspot, and was captioned "BEST SELLER BADGES EXPOSED!! NOT ALL BEST SELLERS ARE REAL!!" while displaying Plaintiff's book with a red slash through the "best seller" designation;

d. Defendant's March 9, 2026, Instagram reel, and March 10, 2026, Facebook reel including overlaid text stating, "A year ago I took Hacia Atherton to this resort. I thought she was the love of my life. 8 months later I found out she was still sleeping with her husband Simon Harris. Our whole relationship was just a way for her to get a US Visa and financial support while in the US . . ."

e. Defendant's March 14, 2026, Instagram post featuring an image of himself with two women, overlaid with the text, "Dating Hacia Atherton for a year: $100,000. Life after she's gone: PRICELESS!" and captioned, "Moving On After The Lies & Deception of Hacia Atherton Author of The Billion Dollar Blindspot."

f. Defendant's March 30, 2026, Instagram reel depicting a fictitious book titled Secrets of a Scammer's Success alongside images of

Plaintiff and text stating, "The Book Hacia Atherton Should Have Written, Not the Billion Dollar Blindspot," and captioned, "Hacia Atherton, Lies, Deceit, and Dual Life. Not someone to take business or life advice from. The Billion Dollar Blindspot doesn't tell the real story."

175. The foregoing statements are all defamatory *per se* as they falsely accuse Plaintiff of unchastity, deceptive commercial manipulation, immigration fraud, and tend to injure Plaintiff in her trade, business, and profession as a published author, professional speaker, and workplace culture consultant. Every one of these statements is false. To be clear, Plaintiff did not employ any "trick" to obtain "best-seller" status, did not engage in infidelity, as she was, at minimum, legally separated from her husband at the relevant times, did not enter into a relationship with Defendant for the purpose of committing immigration fraud, and did not, in fact, commit immigration fraud.

176. Accordingly, Plaintiff is not required to prove special damages. *See Drennen v. Westinghouse Elec. Corp.*, 328 So.2d 52, 54 (Fla. 1st DCA 1976) ("[a] publication is libelous per se when it imputes to another a criminal offense amounting to a felony, or conduct, characteristics, or conditions incompatible with proper exercise of one's lawful business, trade, profession or office"); *NITV, L.L.C. v. Baker*, 61 So.3d 1249, 1254 (Fla. 4th DCA 2011)

("communication that imputes to another conduct, characteristic, or condition incompatible with the proper exercise of his lawful business, trade, profession or office is slander per se"); *Doe v. Finkelman*, 429 So.3d 456, 471 (Fla. 4th DCA 2025) ("[s]tatements which impute unchastity on the part of a woman plaintiff are libelous per se.").

177.    Because Mr. Vitale is a nonmedia defendant and his statements constitute defamation *per se*, general damages are conclusively presumed under Florida law.

178.    Ms. Atherton is entitled to presumed and actual damages for reputational harm, emotional distress, and economic losses.

179.    Ms. Atherton is entitled to punitive damages upon compliance with the procedural requirements of Florida Statutes § 768.72.

## Count X: Defamation

180.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as if fully set forth herein.

181.    In the alternative to Count IX, and to the extent any of the allegations in Count IX are not deemed defamatory *per se*, each constitutes actionable defamation *per quod*, as they are false statements of fact that, under the circumstances of publication, reasonably tend to harm Plaintiff's reputation and cause damage to her personal and professional standing.

182.    Plaintiff is a private figure.

183. On multiple occasions, as alleged above, Mr. Vitale published false and defamatory statements of fact about Ms. Atherton to third parties – including, but not limited to, accusations that Ms. Atherton had been unfaithful to Defendant, abused the immigration process,  and falsely represented the sales of her book by purchasing or manipulating "best seller" status.

184. The statements were published on various social media platforms visible to third parties and directly referenced Ms. Atherton so that third parties understood the posts to be about Ms. Atherton.

185. Defendant knew the statements were false or, in the alternative, acted with reckless disregard for their falsity.

186. As a direct and proximate result of Defendant's defamatory statements, Plaintiff has suffered damages, including but not limited to injury to her reputation, humiliation, embarrassment, emotional distress, mental anguish, and damage to her personal and professional relationships. Plaintiff has also suffered economic harm, including lost business opportunities and impairment of her ability to engage in her profession and business ventures. Plaintiff continues to suffer such damages and will continue to do so in the future.

## Count XI: Unjust Enrichment

187. Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as if fully set forth herein.

188. Plaintiff conferred benefits in connection with Allstar Consulting Services in the approximate amount of $50,000, consisting of monetary expenditures and the value of professional services provided toward the development and promotion of the business.

189. Allstar Consulting Services was formed in Defendant's name and remained at all relevant times under Defendant's exclusive management and control. None of the financial benefits conferred were pursuant to a contractual arrangement.

190. Defendant knowingly accepted, utilized, and retained the benefit of Plaintiff's contributions in connection with the formation, branding, and promotion of the business.

191. Plaintiff's contributions were made in the context of an understanding that the parties were to operate in a collaborative business arrangement involving shared development of Allstar Consulting Services. However, Defendant maintained exclusive control over the business and restricted Plaintiff's participation in business activities, including attendance at events and engagement in work-related opportunities.

192. Plaintiff further relied on the parties' business relationship, including its connection to Plaintiff's immigration status, in continuing to provide contributions to the business. As a result, Defendant retained the benefit of Plaintiff's contributions while providing only $2,174.25 in compensation over approximately six months of employment.

193. Plaintiff did not receive reasonable or adequate compensation commensurate with the value of contributions. The $2,174.25 received was nominal and did not reflect the fair value of Plaintiff's contributions. Rather, Plaintiff was effectively excluded from any meaningful participation in the business, including attendance at events and work-related opportunities, while Defendant retained exclusive use and benefit of Plaintiff's contributions.

194. When Plaintiff terminated the relationship with Defendant, Defendant refused her offer to purchase the business or arrange a sale. Instead, he immediately shut down the business and retained all benefits derived from Plaintiff's contributions without compensation or reimbursement.

195. Under the circumstances, it would be inequitable to permit Defendant to retain the benefit of Plaintiff's investments because Defendant held out Allstar Consulting as a legitimate joint venture while secretly intending it only as a coercion mechanism to control Plaintiff's immigration status and force her into sexual servitude.

196.   Additionally, Defendant knew Plaintiff had depleted her savings, had no alternative employment authorization, and had closed her Australian residence — and he leveraged that vulnerability to extract contributions from Plaintiff.

## Count XII: Invasion of Privacy by Intrusion Upon Seclusion

197.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as if fully set forth herein.

198.   Defendant intentionally and without consent intruded upon Plaintiff's private affairs by electronically recording Plaintiff while she was engaged in sexual activity with men whom Defendant had solicited and arranged to bring into the parties' shared residence.

199.   At the time of the intrusion, Plaintiff was within a private setting where she had a reasonable expectation of privacy and was engaged in highly intimate and sexual conduct.

200.   Such an intrusion would be highly offensive to a reasonable person, is so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency. It involves the secret electronic recording of Plaintiff while she was being subjected to nonconsensual sexual activity, capturing her at her most vulnerable and coerced state within a private residence.

201. A reasonable person would find this conduct especially egregious because it not only involves the forced commission of sexual acts without Plaintiff's consent, but also the deliberate creation of a permanent recording of that abuse, compounding the violation of Plaintiff's bodily autonomy, privacy, and dignity.

## JURY TRIAL DEMAND

202. Plaintiff demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure on all claims so triable.

## PRAYER FOR RELIEF

Plaintiff hereby respectfully requests that this Court enter judgment in her favor against Defendant Paul Vitale and award her the following relief:

1. Compensatory damages for all economic losses, including but not limited to lost wages, lost business income, lost earning capacity, and the cost of past and future medical and psychological treatment, in an amount to be determined at trial;

2. Compensatory damages for all non-economic losses, including but not limited to pain and suffering, emotional distress, psychological trauma, post-traumatic stress disorder, anxiety, depression, humiliation, loss of reputation, damage to professional standing, and impaired ability to function, in an amount to be determined at trial;

3. Restitution of the monies Plaintiff invested in Allstar Consulting;

4. Punitive damages in an amount to be determined at trial;

5. Attorney's fees and costs pursuant to 18 U.S.C. § 1595(a);

6. Prejudgment and post-judgment interest at the maximum rate permitted by law;

7. A narrowly tailored injunction prohibiting Defendant from further publishing, distributing, disseminating, or sharing any sexually explicit images, videos, or information about Plaintiff, whether online or otherwise;

8. An order requiring Defendant to remove all sexually explicit images, videos, posts, and defamatory statements about Plaintiff from all websites, social media platforms, and any other public forums where they currently appear;

9. Such further and other relief as the Court deems just, proper, and equitable.

Respectfully submitted,

*Matt Sarelson*

Matthew Seth Sarelson, Esq.
**DHILLON LAW GROUP INC.**
1601 Forum Place, Suite 202
West Palm Beach, Florida 33401
Telephone: (305) 773-1952
Florida Bar. 888281
msarelson@dhillonlaw.com

/s/ *Marissel Descalzo*
Marissel Descalzo, Esq.
Florida Bar No. 669318
MD@descalzolaw.com
**DESCALZO LAW, P.A.**
2 S. Biscayne Blvd., Suite 2530
Miami, Florida 33131
Telephone: (305) 489-1018